[No. 23188. Department One. September 3, 1931.]

LAFE TENNESON, *Respondent,* v. KADIAK FISHERIES COMPANY, *Appellant.*[1]

[1]Reported in 2 P. (2d) 745.

*Stephen V. Carey,* for appellant.

*Vanderveer, Beardslee & Bassett,* for respondent.

MAIN, J.—This action was brought to recover damages for personal injuries. The cause came on for trial before the court and a jury. At the conclusion of the plaintiff's evidence, the defendant challenged the sufficiency thereof, and moved for a judgment, which motion was overruled. The defendant offered no testimony, but rested upon the case made by the plaintiff. A verdict in favor of the plaintiff in the sum of $3,750 was returned. Motion for judgment notwithstanding the verdict, and in the alternative for a new trial, being made and overruled, judgment was entered upon the verdict, from which the defendant appeals.

The facts essential to be stated are these: The appellant owns and operates two canneries in the vicinity of Danger Bay (Kadiak Island, Alaska), approximately sixty miles distant from each other. In connection with these canneries, it operates a number of cannery tenders, including the "Frieda," on which the respondent worked as a deck hand. The "Frieda" is a vessel about seventy feet in length, equipped with Diesel engines and winches driven by electric power. This vessel and others were employed about the canneries in towing rafts of piling, repairing fish traps, transporting fish from the traps to the canneries, etc.

On the occasion when the respondent was injured, in June, 1928, the "Frieda" had gone from the cannery at Kadiak to Danger Bay, some thirty miles away, to get a raft of piles and logs to tow back to the cannery.

After the raft had been taken in tow, some rough weather was encountered and the raft went adrift, the piling being scattered on the beach, and the next day the crew of the "Frieda" started to gather the piling and logs together to reassemble into a raft again. Such a raft consists of twelve or fifteen tiers of piles and logs laid one tier on top of another and then lashed together. In making up the raft, the piles are assembled by the use of winches by pulling one pile upon and across those already in place. The respondent was stationed on the raft, and it was his duty to guide the oncoming piles into place with a peavey. As to this operation, he testified as follows:

"I was standing in the front of this big piling— that is where he sent me to set my peavey down in the piling below—and I was holding on my arms, that way (indicating), to hold it from slipping ahead any more, because it was up here (indicating) at the corner as far as we wanted it. Then he went ahead on the electric winch, and this is an awfully fast winch too, and just at the time when it hit, it hit with a jerk, and it just took the peavey out of my hand, and I was right up at the water's edge, and instead of jumping into the water, which was the best way to do, I jumped across the piling here (indicating) and started away from it, and when the piling was up here, there was a kind of ridge on the raft here (indicating) and it swung on it and it caught me as I was running away from it. I don't know much about it, but I was lying right underneath and the boys were digging me out. I was lying right underneath the piling."

He further testified that, as the piling was being piled into place, it struck a "high spot" on the raft, which caused it to swing around. It was for the injury which he sustained on this occasion that the present action was brought.

The first question is whether the evidence on the question of the appellant's negligence in too

rapidly operating the winch was sufficient to take the case to the jury.

Upon direct examination, the respondent testified:

"Q. You say that the captain told you to go there? A. Yes, sir. Q. How fast did he go with his winch? A. I cannot say how fast it went, because the electric winch, when you start it, and start full ahead, of course when the cable started up, it just give a big jerk on the piling. Q. And tore it out of your hand? A. Tore the peavey out of my hand. Q. Was it necessary to start the winch that fast? A. No. It could have been run at slow speed."

On cross-examination, he testified in part:

"Q. The winch was an electric winch, was it not? A. Yes, sir. Q. She operated all right, didn't she? A. Yes, sir. Q. Nothing wrong with the winch? A. No. Q. It had different speeds? A. Yes, sir. Q. And you would use one speed or the other, depending upon the difficulty of the work that had to be done? A. Yes, sir, but at slow speed there was not much power in it. Q. And when you got a heavy weight to move, why you had to use the higher speed in order to move the piling? A. Yes, sir."

On redirect examination, he testified:

"Q. When you were pulling the one end of that pole around, the small end of the pole around, you say you moved the spreader out toward the end farther? A. Yes. There was just two cables on it; just one cable was going to the small end of it. Q. You set it out toward the end? A. Yes, the small end. Q. Was that any strain on the winch? A. That wasn't strain on the winch; it would be just a light pull. Q. Could it have been done in low gear? A. Absolutely in low gear. Q. What was it that jerked that peavey out of your hand? A. Well, it was just too much speeding the winch, I would call it, more than anything else. Q. Did it hit with a jerk? A. Yes, it hit with a jerk. . . . Q. Has it a control lever somewhat on the principle of a street car control lever? A. Yes. Q. When you move it up to a certain notch it goes so fast?

A. Yes. Q. It doesn't move faster until you deliberately move it over the notches? A. No.''

Under this evidence, we think it cannot be held as a matter of law that the speeding of the engine was not negligence, but the question was one of fact for the jury. The testimony of the respondent must be considered in its entirety, and, when so considered, it presented a jury question.

The next question is whether the respondent assumed the risk of negligence of the operator of the winch. In this connection, it is admitted that the case is governed by the Federal employers' liability act (45 U. S. C. A., § 51), the provisions of which are made available to seamen by the terms of § 33 of the merchant marine act of 1920 (46 U. S. C. A., § 688).

In *Rasmussen v. Twin Harbor Stevedoring & Tug Co.,* 147 Wash. 260, 265 Pac. 1085, it was held that, under that act, the foreman of a stevedoring crew, superintending the loading of freight, did not assume the risk of the negligence of the hatch tender in failing to give warning of a dangerous load being lowered into the hold. It was there said:

''The first question is, whether the respondent assumed the risk of the negligence of the hatch tender in sending down the load with the loose plank on top thereof without giving a special warning. In *Seaboard Air Line R. v. Horton,* 233 U. S. 492, it was held that the Federal employers' liability act did not take away the common law defense of assumption of risk, except in so far as the act so provided. That case, together with others, was later considered in the case of *Reed v. Director General of Railroads,* 258 U. S. 92, where, after reviewing the cases, it was said:

'' 'In actions under the Federal act the doctrine of assumption of risk certainly has no application when the negligence of a fellow servant which the injured party could not have foreseen or expected is the sole, direct and immediate cause of the injury. To hold

otherwise would conflict with the declaration of Congress that every common carrier by railroad while engaging in interstate commerce shall be liable to the personal representative of any employee killed while employed therein when death results from the negligence of any of the officers, agents or employees of such carriers.'

"It thus appears that the respondent in the present case cannot be said, as a matter of law, to have assumed the risk, unless the negligence of the hatch tender in failing to give special warning should have been foreseen or expected by him. . . .

"Under the evidence in this case, it cannot be held as a matter of law that the hatch tender was not negligent when he sent down the bad load without giving a special warning. This was negligence which the respondent could not have foreseen or expected and, as stated, was not assumed."

If the risk of the negligence of the hatch tender in that case was not assumed, it cannot be held, as a matter of law, that the risk of the negligence of the operator of the winch in this case was assumed by the respondent. There is no substantial distinction between the two cases.

The case of *Hartford v. Northwestern Stevedoring Co.*, 148 Wash. 501, 269 Pac. 831, is different. There it was held that a longshoreman assumed the risk of injury in assisting to remove from a hatchway a strongback weighing one thousand pounds, which was dropped upon, or bounced upon, his foot, when a fellow-servant let it drop, where he had long experience in the work, was watching the operation, and stepped back until he knew or thought he was in the clear, knowing that it would bounce toward him if dropped. That was not the situation in the present case. The respondent did not assume the risk as a matter of law.

The next question is whether the court erred

in submitting the cause to the jury. Complaint is made of instruction four, wherein the jury were told that the law imposes upon an employer the duty to use reasonable care in providing the employee with a safe place to work. The instruction is correct as an abstract statement of law, but it was not applicable to any issue in the present case. By the instruction, no issue on the question of providing a safe place to work was submitted to the jury.

In instruction one, the court, in stating the issues to the jury, said that the basis of the action was that the master of the vessel "negligently operated the winch too rapidly." In instruction two, the jury were told that there could be no recovery unless the respondent, by a fair preponderance of the evidence, proved that the appellant "was negligent in the manner set forth in his complaint." In instruction five, again it was said that, before the respondent could recover, it was essential that he prove by a preponderance of the evidence that the "employer was negligent in some particular manner alleged in the complaint." Nowhere in the instructions was the question of a safe place to work submitted to the jury as an issue for them to determine.

In *Gabrielsen v. Seattle*, 150 Wash. 157, 272 Pac. 723, 63 A. L. R. 200, it is said:

"The giving of mere abstract instructions, correct in principle, is not grounds for reversal, unless their tendency is to confuse or mislead the jury."

Even though instruction four should not have been given, the giving of it, when considered in connection with the other instructions, could not have any tendency to confuse or mislead the jury.

In *Hellenthal v. Edmonson*, 158 Wash. 276, 290 Pac. 831, and many other cases from this court that might be cited, it has been held that, where an issue is sub-

mitted to the jury, upon which there is no evidence, the instruction is reversible error; but that rule does not cover the present situation, because, as stated, here the issue of a safe place to work was not presented to the jury. This case falls within the rule of the case of *Gabrielsen v. Seattle, supra.*

The judgment will be affirmed.

TOLMAN, C. J., PARKER, MITCHELL, and HOLCOMB, JJ., concur.